IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF C.M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF C.M., ALLEGED TO BE A DANGEROUS SEX OFFENDER.

C.M., FORMERLY KNOWN AS R.H.P., APPELLANT,

V.

MENTAL HEALTH BOARD OF THE FIRST JUDICIAL DISTRICT, APPELLEE.

Filed June 11, 2024.    No. A-23-895.

Appeal from the District Court for Gage County: JULIE D. SMITH, Judge. Affirmed.

Lee Timan and Dania Ontiveros, of Nelson, Clark & Timan, P.C., for appellant.

Roger L. Harris, Gage County Attorney, and Michael W. Wehling for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

MOORE, Judge.

## INTRODUCTION

C.M. appeals from the order of the district court for Gage County, which affirmed the decision of the Mental Health Board of the First Judicial District (the board) continuing his custody by the Nebraska Department of Health and Human Services (DHHS) for inpatient treatment as a dangerous sex offender. We affirm.

## STATEMENT OF FACTS

C.M. was released from incarceration in June 2008, after serving his sentence for three counts of third degree sexual assault. Following an October 2008 commitment hearing, the board determined that C.M. was a dangerous sex offender. The board placed C.M. in the custody of DHHS for inpatient treatment. C.M. has remained under inpatient commitment since that time. C.M. was originally placed at the Norfolk Regional Center (NRC). He was released from NRC

and placed at the Lincoln Regional Center (LRC) in 2017. During his time at LRC, C.M. entered the transitions program, which is considered the "last stop" before release back into the community. In the transitions program, C.M. was able to work in the community. In September 2021, C.M. was found to be in violation of his work release status. C.M. was then removed from the transitions program and returned to NRC, where he has remained.

On February 16, 2022, C.M. filed a motion for a review hearing before the board to determine whether it was appropriate and necessary to continue his inpatient commitment. He subsequently filed a motion, seeking an independent evaluation of whether he continued to be a dangerous sex offender and/or whether "continued jurisdiction over [him]" was necessary. The evaluation was conducted by Betty Kola, Ph.D., a licensed mental health practitioner.

A review hearing was held on June 2, 2023. The board heard testimony from C.M. and received exhibits offered by the parties. C.M. offered Kola's written evaluation. The State offered a letter written by David A. Mitchell, Ph.D., a licensed psychologist and director of the psychology department at NRC, concerning C.M.'s treatment progress. The State also offered the most recent treatment plans for C.M. prepared by NRC.

In his testimony, C.M. confirmed that he has had no law violations since his release from prison in 2008. C.M. testified about his removal from the transitions program after his previous placement at LRC. He indicated that he was removed from that program due to the discovery of "saved pictures of nude adult women" on a cell phone that he had with him during his work release. C.M. denied having any role in saving or taking those pictures on the phone, which he stated had been provided to him by his brother. C.M. testified that he did not access those images while the phone was in his possession and denied having "any kind of inappropriate activity in regards to any other person" at that time.

C.M. testified that since his return to NRC, he has been cooperative with all program requirements, has consistently attended his counseling and group sessions, and has only had "[m]inor" rule violations involving his dealings with "other peers" and "getting a little temper." He also stated that he has not had any kind of inappropriate interactions with staff members at either NRC or LRC. C.M. expressed his belief that his failure to admit to the underlying criminal offense should no longer be considered as actually contributing to future recidivism. He also testified that further hospitalization is not necessary because he does not believe there is anything that the program can teach him that he does not already know. According to C.M., the only issue he continues to need to work on is dealing with his temper, which is an issue not related to his commitment as a dangerous sex offender.

One of the tests administered to C.M. by Kola during her evaluation was "the Static-99R, an instrument intended to position offenders in terms of their relative degree of risk for sexual recidivism based on commonly available demographic and criminal history information that has been found to correlate with sexual recidivism in adult male sex offenders." C.M.'s score of 6 on this instrument placed him "in Risk Level IVb for being charged or convicted of another sexual offense." Offenders with this score, "[o]n average," have a sexual recidivism rate "that is 3.8 times the rate of offenders in the middle of the risk distribution." Another of the tests administered by Kola was the "STABLE-2007," an instrument also "intended to position offenders in terms of the relative degree of risk for sexual recidivism." C.M. scored a 4 on this test, which "falls within the interpretive range considered to be a Moderate level of stable dynamic needs."

In the "IMPRESSIONS AND RECOMMENDATIONS" section of her report, Kola expressed her clinical opinion that C.M. "would benefit from completing sex offense-specific outpatient treatment to include individual and group therapy supported by adjunct sex offense specific group sessions." She stated further, "Upon engagement in group sessions, the frequency of individual sessions could be reduced to 2-3 times per month." However, Kola also stated:

Based upon the indication instruments used during this abbreviated assessment, [C.M.] presents with high risk of recidivism. His strengths include attending Personal Development groups regularly, socializing appropriately with a peer while cooking in the facility kitchen, supervision by [NRC]. Weaknesses/risks for reoffending include denial of accountability of his sexual offense, few friends, no family support system, failure to address his issues, poor problem-solving skills, using sex as a coping method, and impulsivity. His prognosis/amenability to treatment is guarded due to his minimization of offense behaviors and his lack of credibility due to a variety of past experience claims that are unsubstantiated.

Based on assessment, should he reoffend, [C.M.] is likely to do so via breaching conditions of release. If [C.M.] were at risk of sexual misconduct, it would likely include a scenario in which he has access to pubescent minors and vulnerable adult females. [C.M.] can be expected to manage his risk for sexual offending when he has accepted responsibility for his sexual offen[s]es, reduced his impulsive behaviors, improved his problem solving skills, improved his emotional regulation, reduced his sexual preoccupation, stable employment, relationships, and housing.

In his letter, dated May 16, 2023, Mitchell stated:

[C.M.] was returned to NRC on 9/29/21 from [LRC] after he obtained a cell phone and used the device to view pornography; this was seen as a significant rule violation for someone in a sex offender treatment program. Since returning to NRC, [C.M.] has generally participated well in the treatment program. At the time of his most recent treatment plan (2/24/23), he had not received any privilege restrictions for rule violations in the prior three months; rule violations had been a nagging concern for this patient after his return from LRC. He generally attends his treatment activities on a consistent basis. In group therapy, he regularly offers feedback to other patients, but struggles with addressing or acknowledging any of his own sexual thoughts or behavior.

NRC's plan for [C.M.] is for him to earn his Level 4 privileges and return to LRC for continued treatment and eventual community reintegration. This is the standard path most offenders take through the Nebraska sex offender treatment program. LRC is seen as an important part of the treatment process since this is where patients are transitioned to the community in a structured way with support services available. NRC would not recommend discharge to the community at this time.

The exhibit containing NRC treatment plans for C.M. included the most recent plan, dated May 19, 2023. The "Progress Update" portion of the May 2023 plan states:

[C.M.] continues to exhibit risk factors that are not solved and inpatient treatment at NRC continues to be the least restrictive environment to ensure community safety. These risk

factors include: poor cooperation with supervision, negative emotionality, poor problem-solving, impulsivity, and capacity for stable relationships. Risk [f]actors such as sexual preoccupation, using sex as coping, and failure to address his sexual issues are seen as improving.

At the conclusion of the hearing and after a brief recess, the board announced its decision to follow Mitchell's recommendation and order C.M.'s return to NRC for further treatment, based on its understanding that the mental health professionals who worked with him believed him "still to be a mentally ill sexual offender." The board subsequently entered a written order, stating, "After reviewing the exhibits and the testimony given, the board follows the recommendations of [Mitchell] and orders that [C.M.] be returned to the custody of [DHHS] for further appropriate treatment."

On June 30, 2023, C.M. filed a petition in error, appealing the board's decision to the district court, which affirmed. C.M. subsequently perfected his appeal to this court.

ASSIGNMENTS OF ERROR

C.M. asserts that the district court erred in finding that (1) his diagnoses have not yet been successfully treated or managed to the point where it would be safe to release him to the community and (2) his inpatient commitment remains the least restrictive treatment alternative.

STANDARD OF REVIEW

The district court reviews the determination of a mental health board de novo on the record. *In re Interest of R.T.*, 30 Neb. App. 405, 969 N.W.2d 911 (2021). In reviewing a district court's judgment, an appellate court will affirm unless it finds, as a matter of law, that clear and convincing evidence does not support the judgment. *Id.*

ANALYSIS

*Statutory Framework.*

Following the completion of his criminal sentences, C.M. was committed to NRC as a dangerous sex offender pursuant to Nebraska's Sex Offender Commitment Act (SOCA). See Neb. Rev. Stat. §§ 71-1201 to 71-1226 (Reissue 2018). The purpose of the SOCA is "to provide for the court-ordered treatment of sex offenders who have completed their sentences but continue to pose a threat of harm to others." § 71-1202. A "dangerous sex offender" is defined as:

(a) a person who suffers from a mental illness which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his or her criminal behavior or (b) a person with a personality disorder which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of two or more sex offenses, and who is substantially unable to control his or her criminal behavior.

Neb. Rev. Stat. § 83-174.01(1) (Reissue 2014). See, also, § 71-1203(1). "Likely to engage in repeat acts of sexual violence means the person's propensity to commit sex offenses resulting in serious harm to others is of such a degree as to pose a menace to the health and safety of the public."

§ 83-174.01(2). Section § 71-1202 of the SOCA provides that if dangerous sex offenders do not obtain voluntary treatment, they are subject to involuntary custody and treatment following mental health board proceedings. C.M. was committed to the custody of DHHS and placed at NRC for inpatient treatment following the board's findings in October 2008 that he was a dangerous sex offender and that neither voluntary hospitalization nor other treatment alternatives less restrictive of his liberty than inpatient or outpatient treatment ordered by the board were available or would suffice to prevent the harm to the public. See § 71-1209(4).

C.M. sought review of his commitment as a dangerous sex offender under § 71-1219, which provides in subsection (1) that upon the filing of periodic reports by the person or entity in charge of the committed offender's treatment plan, the committed individual "may request and shall be entitled to a review hearing by the mental health board and to seek from the board an order of discharge from commitment or a change in treatment ordered by the board." Section 71-1219(2) states:

> The board shall immediately discharge the subject or enter a new treatment order with respect to the subject whenever it is shown by any person or it appears upon the record of the periodic reports filed under section 71-1216 to the satisfaction of the board that (a) the subject's mental illness or personality disorder has been successfully treated or managed to the extent that the subject no longer poses a threat to the public or (b) a less restrictive treatment alternative exists for the subject which does not increase the risk that the subject will commit another sex offense. When discharge or a change in disposition is in issue, due process protections afforded under the [SOCA] shall attach to the subject.

The State bears the burden to show by clear and convincing evidence that the subject remains mentally ill and dangerous, and under the plain language of the statute, the board must determine whether the subject's mental illness or personality disorder has been successfully treated or managed; this necessarily requires the board to review and rely upon the original reason for commitment. See *In re Interest of D.I.*, 281 Neb. 917, 799 N.W.2d 664 (2011). Once the subject of a petition has exercised his or her right to a review hearing, and asserted that there are less restrictive treatment alternatives available, the State is required to present clear and convincing evidence that a less restrictive treatment alternative is inappropriate. *Id.* At that point, the subject may further rebut the State's evidence. *Id.*

*Successful Treatment.*

C.M. asserts that the district court erred in finding that his diagnoses have not yet been successfully treated or managed to the point where it would be safe to release him to the community. He argues that he presented evidence at the review hearing showing he is not a danger to the community. He points to his testimony that he has had no law violations since his release from prison in 2008, his compliance with program requirements since his return to NRC, his lack of inappropriate interactions with staff members at NRC and LRC, his testimony that there is nothing more he can learn by participation in the inpatient treatment program, and his belief that failure to admit to the underlying criminal offense should not be considered a factor contributing to future recidivism. C.M. also references his previous placement in the transitions program at LRC and he notes his testimony that he had no role in saving or taking the images found on the

cellphone in his possession that led to his removal from that program and his return to NRC. Finally, he notes his testimony that the only issue he needs to work on is his temper, which he contends is not an issue related to his commitment as a dangerous sex offender.

Section 71-1219 requires the board to determine whether the subject's mental illness or personality disorder has been "successfully treated or managed." The evidence presented at the review hearing shows that although C.M. progressed in his program at NRC to the point where he was placed in a transitions program at LRC, he violated the rules of that program by obtaining a cell phone on which nude pictures of adult women were found. After this violation, C.M. was returned to NRC, where, as of May 2023, he was participating well and consistently in the treatment program. He had not received any recent privilege restrictions, but rule violations had been a "nagging concern" since his return from LRC. He continued to struggle with addressing or acknowledging his own sexual thoughts or behavior. In terms of his progress, the May 2023 treatment plan noted that C.M. continued to exhibit unsolved risk factors, including poor cooperation with supervision, negative emotionality, poor problem-solving, impulsivity, and capacity for stable relationships. Other risk factors, such as sexual preoccupation, using sex as coping, and failure to adequately address his sexual issues, were seen as improving. In her evaluation of C.M., Kola administered various tests, and based upon the results of that testing, she determined that C.M. presented a high risk of recidivism.

Based on its acceptance of Mitchell's recommendation and its order of C.M.'s return to DHHS custody for further appropriate treatment, the board found clear and convincing evidence that C.M.'s condition had not been successfully treated or managed, and we find no error in that conclusion. The district court did not err in affirming the board's decision in that regard.

*Least Restrictive Alternative.*

C.M. asserts that the district court erred in finding that his inpatient commitment remains the least restrictive treatment alternative. He argues that he presented sufficient evidence to show that a less restrictive treatment plan would be appropriate and available through the outpatient plan proposed by Kola, and that the State was then required to prove by clear and convincing evidence that an outpatient commitment would be inappropriate. He acknowledges the State's evidence, but he argues that Mitchell's letter and the most recent treatment plan should be seen as a recommendation that further treatment is necessary, and that the State's evidence does not adequately address whether any less restrictive treatment alternative, such as outpatient treatment, would be appropriate for him.

While Mitchell does not explicitly state in his letter that there is not a less restrictive treatment option that would meet C.M.'s needs, the most recent treatment plan for C.M. clarifies that inpatient treatment at NRC continues to be the least restrictive environment to ensure community safety. C.M. relies on Kola's opinion that he "would benefit from completing sex offense-specific outpatient treatment," but she does not actually opine that such a program is the least restrictive alternative to meet his needs. Kola also expressed the opinion that her testing showed a high risk of recidivism, that if he should offend, C.M. would likely do so via breaching conditions of his release, and that if he were at risk for sexual misconduct, it would likely include a scenario with access to prepubescent minors and vulnerable adult women. The board accepted Mitchell's recommendation against discharge to the community and ordered C.M.'s return to

DHHS custody for further appropriate treatment. We find that the State presented clear and convincing evidence that secure inpatient treatment remains the least restrictive treatment alternative. The district court did not err in affirming the board's determination in this regard.

## CONCLUSION

We affirm the judgment of the district court, which affirmed the board's decision denying C.M.'s request for an order of discharge or change in treatment and ordering his return to the custody of DHHS for further appropriate treatment.

AFFIRMED.